UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUANITA REED, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 03-1085 (RMC) |
| ) | |
| DISTRICT OF COLUMBIA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case stems from the death of Charquisa Johnson, who was shot and killed by Officer John Fitch of the D.C. Metropolitan Police Department ("MPD") on April 26, 2003. Juanita Reed, individually as the aunt of Ms. Johnson and as Ms. Johnson's personal representative and next friend, joined by Sherri R. Hamm, in her individual capacity as grandmother and as personal representative and next friend of Ja'pria Grady and Remy Hamm, Ms. Johnson's children, allege that Officer Fitch wrongfully used deadly force. Defendants are Office Fitch, the District of Columbia, and Charles H. Ramsey, Chief of the MPD. Defendants move for summary judgment on all counts except Count VI, which alleges that Defendants committed an assault and battery upon Ms. Johnson. As explained below, the Court will grant in part and deny in part Defendants' motion for partial summary judgment.

**I.  BACKGROUND FACTS**

On April 26, 2003, MPD Officers John Fitch, Ryan Roe, Matthew Daily, and Brandon Shafer responded to a radio run for a man with a gun at 14th and V Streets, S.E., in Washington, D.C.

Defs.' Statement of Material Facts Not in Dispute ("Defs.' Statement") ¶ 2. An individual matching the description of the person with a gun was seen by the officers in the doorway to the back entrance to 2312 Green Street, S.E. *Id*. ¶ 3. Officers Fitch and Shafer stopped to question the individual but determined that he was not the person shooting the weapon. *Id*. ¶¶ 3-4. The officers released the man and entered the back entrance of the building and exited on the front, where Officers Daily and Roe were waiting by the police vehicle.[1] *Id*. ¶ 4. As the officers started to get into their car, they heard a gunshot coming from 2312 Green Street. *Id*. ¶ 5. They immediately responded, with Officer Fitch entering the building first, followed by Officers Roe, then Shafer, and then Dailey. *Id*. ¶ 6. While inside the building, Officer Fitch shot and killed Ms. Johnson. These facts are not in material dispute. The circumstances surrounding the shooting are very much in dispute.

        According to the officers, the following occurred. Officer Shafer saw someone coming around the corner and up the internal steps. Defs.' Mem. in Supp. of Partial Summ. J. ("Defs.' Mem.") Ex. 3 (Shafer. Dep.) at 41. He heard Officer Fitch say "drop the gun" at least two times. *Id*. at 42. He then saw a hand with a gun coming up the steps and immediately heard two distinct gunshots. *Id*. at 43. Officer Fitch fell to the left. *Id.* at 109. Officer Roe saw a woman coming up the stairs with a gun in her right hand. Defs.' Mem. Ex. 4 (Roe Dep.) at 69. Officer Shafer observed that Officer Fitch and the woman, later identified as the decedent Ms. Johnson, were close enough to touch each other if both had reached out their arms. Shafer Dep. at 44. Officer Shafer heard the gun drop to the floor and then saw it on the stair landing. *Id.* at 45. He also saw

---

[1] The front entrance of the building opens onto a landing, with a half flight of stairs going up and a half flight of stairs going down. Defs.' Mem. in Supp. of Partial Summ. J. ("Defs.' Mem.") Ex. 3 (Shafer. Dep.) at 31-32.

what resembled a bullet hole by the front door inside Apartment 101, which was Ms. Johnson's apartment. *Id.* at 94.

Defendants state that further investigation revealed a bullet hole in the wall of the apartment from which a bullet was removed. Defs.' Mem. Ex. 5 (McCoy Dep.) at 22-23. Bullet fragments were also found on the scene. *Id.* at 47; *see also* Defs.' Mem. Ex. 6 (Hammett Dep.) at 26, 31. A bullet casing that had been ejected from a nine millimeter gun was recovered from the floor of the scene of the shooting. *Id*. at 24-25. A Jenkins 9 millimeter Glyco 59 firearm that was not issued by the MPD was recovered from the landing. *Id.* at 10-12.

According to Plaintiffs, who rely the deposition testimony of eyewitnesses Jamiere Thomas and Antoine Wade, a very different sequence of events transpired once the police officers re-entered 2312 Green Street, S.E. Plaintiffs contend that Officer Fitch, with his gun drawn, first paused and yelled "don't move" to Ms. Thomas and Mr. Wade, who were on the landing inside the front door of the building. Pls.' Mem. Ex. 8 (Thomas Dep.) at 14; Pls.' Mem. Ex. 9 (Wade Dep.) at 11. Mr. Wade recounted that "[a]ll of a sudden, Charquisa [Johnson] comes out [sic] of the house with no idea what was going on, and she swings her body around the steps. As she comes up [sic] the steps, John Fitch yell[ed] 'Get down.' And just started firing." *Id*. According to Mr. Wade, Ms. Johnson's hands were empty and were held up in the air when Officer Fitch shot her. *Id*. at 12. Ms. Thomas said that Ms. Johnson came out of her apartment door about three seconds after Officer Fitch had told her and Mr. Wade not to move. Thomas Dep. at 14. "She was going to go upstairs. And that's how I know she ain't [sic] have a gun because one door was closing – one hand was closing the door, the other hand was out like this." *Id*. Ms. Thomas added, "I knew he was going to fire because he said, 'Get down.' And as soon as he said that he shot her. And after he shot her

the first time, she threw her hands up like this." *Id.* at 15. Ms. Thomas recalls that some kids were playing with firecrackers, which is what caught the attention of the officers, not guns. *Id.* at 9-10.

As a result of this incident, Plaintiffs brought suit alleging that Officer Fitch unreasonably used deadly force and that he, Chief Ramsey, and the District of Columbia are liable. Plaintiffs filed an eight-count Amended Complaint alleging:

> Count I – Officer Fitch's use of deadly force violated 42 U.S.C. § 1983 based on the Fourth, Fifth, and Fourteenth Amendments;
>
> Count II – The District of Columbia, through the direction of Chief Ramsey, violated 42 U.S.C. § 1983 based on the Fourth, Fifth, and Fourteenth Amendments, through an unconstitutional custom and practice of illegal use of force;
>
> Count III – Wrongful Death;
>
> Count IV – Survival Action;[2]
>
> Count V – Negligence;
>
> Count VI – Assault and Battery;
>
> Count VII – The District of Columbia, through the direction of Chief Ramsey, violated 42 U.S.C. § 1983 based on the Fourth, Fifth, and Fourteenth Amendments, by negligently hiring, training, and supervising Officer Fitch; and
>
> Count VIII – Negligent Infliction of Emotional Distress.

Plaintiffs seek compensatory damages, punitive damages,[3] and attorney's fees.

---

[2] Counts III and IV, alleging wrongful death and survival action, merely establish Plaintiffs' standing to bring this suit. They do not allege any additional theories of liability.

[3] Plaintiffs cannot recover punitive damages against the District of Columbia. Punitive damages are not available against a municipality absent an express statutory provision. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Smith v. Dist. of Columbia*, 399 A.2d 213, 218 (D.C. 1979); *see Feirson v. Dist. of Columbia*, 315 F. Supp. 2d 52, 57 (D.D.C. 2004) (punitive damages are not available against the District of Columbia on a § 1983 claim).

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under federal statutes.  28 U.S.C. § 1331.  Here, Plaintiffs brought suit under 42 U.S.C. section 1983.  As this case presents a question of federal law, this Court has original jurisdiction.  The Court has supplemental jurisdiction over the common law claims.  28 U.S.C. § 1367.

### B.  Choice of Law

Where supplemental jurisdiction is exercised, federal courts apply the forum state's choice of law rules.  *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995).  To determine choice of law, the District of Columbia applies the substantial interest test, focusing on the place of the injury, the place were the injurious conduct occurred, the residency of the parties, and the place the parties' relationship is centered.  *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004).  In this case, the District of Columbia is where the alleged injury occurred, where the alleged injurious conduct occurred, and where the parties' relationship was centered.  Thus, the substantial interest test requires the application of D.C. law to the common law claims.[4]

### C.  Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[4] The parties do not address the choice of law issue.  However, by citing to D.C. substantive law, the parties impliedly agree that D.C. law applies to the common law claims.

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Id*.; *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.*

## II. ANALYSIS

Faced with stark disputes of fact, Defendants do not move for full summary judgment. Those matters in dispute obviously must be resolved by a jury if not settled between the parties. Rather, Defendants argue that they are entitled to dismissal of most of the Counts as a matter of law. Plaintiffs agree that their claims under the Fifth and Fourteenth Amendments to the U.S. Constitution cannot proceed and should be dismissed. Pls.' Mem. at 4-5. Plaintiffs otherwise contest all of Defendants' points.

### A. Liability Under Section 1983 for Use of Excessive Force (Count I)

1. No Respondeat Superior Liability

Plaintiffs seek to hold the District of Columbia and Chief Ramsey liable[5] for Officer Fitch's alleged use of excessive force (Count I). The District of Columbia and Chief Ramsey cannot be held liable for the alleged constitutional torts of Officer Fitch on the basis of respondeat superior. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Morgan v. Dist. of Columbia*, 550 F. Supp. 465, 468 (D.D.C. 1982), *aff'd without op.*, 725 F.2d 125 (D.C. Cir. 1983) (Table).

2. Municipal Liability Requires a Custom, Practice, or Policy

A single incident is insufficient to impose liability against the District of Columbia. *Monell*, 436 U.S. at 694. In order to state a claim against a municipality under section 1983, a

---

[5] The Court previously dismissed claims against Chief Ramsey in his official capacity. Minute Entry Order, Feb. 25, 2004. A section 1983 suit against an official in his official capacity is not a suit against the official, but a suit against the official's office, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), and a plaintiff's claims against a defendant in his official capacity are treated as claims against the municipality, *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Atchison v. Dist. of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996). Thus, the claims against Chief Ramsey in his "official" capacity are treated as claims against the District of Columbia.

plaintiff must show that the municipality, through an official custom, practice, or policy, caused the alleged constitutional violation. *Monell*, 436 U.S. at 690-95 (1978); *Triplett v. Dist. of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (plaintiffs must prove that the constitutional tort was an "action pursuant to official municipal policy"). Plaintiffs would have to show that the use of excessive force was so widespread as to constitute a custom, practice, or policy of the MPD. *See Thomas v. Dist. of Columbia*, 887 F. Supp. 1, 5 (D.D.C. 1995).

Plaintiffs erroneously rely on a Memorandum of Understanding between the MPD and the Department of Justice, dated June 13, 2001, (the "Force MOU") to argue that the District of Columbia had a pattern of excessive force by the Metropolitan Police Department, of which Chief Ramsey and the District had actual knowledge. Pls.' Mem. at 6, 13. The MOU is a proactive remedial action undertaken by the MPD in 2001 to minimize the risk of the use of excessive force. *Robinson v. Dist. of Columbia*, 403 F. Supp. 2d 39, 56 (D.D.C. 2005) (because the MOU is remedial, plaintiff's reliance on it to establish constitutional allegations is illogical); *Byrd v. Dist. of Columbia*, 297 F. Supp. 2d 136, 140 (D.D.C. 2003) (MOU is evidence that the District has a proactive remedial approach to the issue of excessive force and is attempting to eliminate past problems). The 2001 Force MOU does not constitute evidence of deliberate indifference that could have caused the alleged constitutional violation in 2003.

3. Supervisor Liability Requires Deliberate Indifference

A supervisor can be held liable for a constitutional violation only if a plaintiff can demonstrate: (1) a grave risk of harm; (2) the supervisor's actual or constructive knowledge of that risk; and (3) the supervisor's failure to take available measures to address the risk. *Maldonado-Denis v. Castillo-Rodriquez*, 23 F.3d 576, 582 (1st Cir. 1994).

To support their argument that a reasonable juror could find that Chief Ramsey was deliberately indifferent to allegations that MPD officers utilize excessive force Plaintiffs again rely on the Force MOU:

> Lieutenant Jacob Kishter's testimony that the District of Columbia still leads all local jurisdictions in the discharge of their weapons against its citizens, is evidence of MPD's deliberate indifference to the policy set forth in the Memorandum. Within the context of *Daskalea v. District of Columbia*, 227 F.3d 442 [D.D.C. 2000] the continuing discharge of weapons, to include [sic] the shooting of Charquisa Johnson, Chief Ramsey, as the Department's top policy maker, can be held liable for MPD's deliberate indifference to the policy set forth in the [Force MOU].

Pls.' Mem. at 12. This argument fails to gain any traction.

First, Plaintiffs failed to submit any deposition testimony by Lt. Kishter stating that the District "leads all local jurisdictions in the discharge of their weapons against its citizens." They submitted only pages 13-36 of his deposition, Pls.' Supp. Ex. Kishter Dep., and this portion does not include the precise question posed or his answer. Lt. Kishter's alleged statements are only reflected in questioning. See *id*. at 14 (Q. You were telling us, testifying with respect to why police discharging their weapons is higher than the other local areas, and you gave us four areas, you gave us social, economical, number two, criminal, number three, and employment, number four.") Without his deposition testimony, the Court cannot accept Plaintiffs' argument based on such testimony.

Even if that testimony actually before the Court, it would not affect the legal analysis of Plaintiffs' claims. Lt. Kishter's alleged statement stands without context, without any comparative demographics such as population, crime rates, or an analysis of the use of excessive force as compared to the use of reasonable force. The assertion that MPD officers discharge their

weapons in greater numbers than police in another jurisdiction does not logically lead to the conclusion that the MPD had a practice of excessive force ignored by the District of Columbia and Chief Ramsey.

Further, Plaintiffs' citation of *Daskalea*, 227 F.3d 442, is not helpful. *Daskalea* presented some egregious allegations about the D.C. Jail and its guards in the D.C. Department of Corrections; it did not involve the MPD. Ms. Daskalea complained that she was harassed, assaulted, and made to strip and dance on a table top for the entertainment of guards and inmates. *Id*. at 439-440. The incidents occurred in 1994 and 1995, shortly after two other lawsuits against the Department of Corrections for its discriminatory treatment of women prisoners in the Jail. *Id.* at 437. The 2001 Force MOU had nothing to do with *Daskalea* and *Daskalea* had nothing to do the MPD or its use of weapons.

In opposing summary judgment, Plaintiffs may not rely solely on allegations or conclusory statements. *Greene*, 164 F.3d at 675. Plaintiffs have failed to bring forth any evidence that Chief Ramsey failed to take measures to address the risk that police officers such as Officer Fitch might unreasonably use deadly force. The claims of deliberate indifference have no evidentiary basis and will be dismissed.

**B. Liability Under Section 1983 For Negligent Hiring, Training, and Supervision**

Plaintiffs also contend that the District of Columbia and Chief Ramsey are liable for failure to properly hire, train, and supervise Officer Fitch in violation of the Fourth Amendment and section 1983 (Count VII). The failure to train or supervise a city employee can amount to an unconstitutional policy when it can be said that the failure amounts to deliberate indifference towards the constitutional rights of persons with whom the officials come in contact. *City of Canton v.*

*Harris*, 489 U.S. 378, 388-89 (1989); *Daskalea*, 227 F.2d at 441. The failure to train must be a proximate cause of the ultimate injury suffered by the plaintiff. *City of Canton*, 489 U.S. at 388-89.

> *Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id*. The Supreme Court explicitly stated that while a particular officer may be inadequately trained, that alone will not render the city liable because his "shortcomings may have resulted from factors other that a faulty training program." *Id*. at 390-91.

Plaintiffs argue that Chief Ramsey is personally liable because he is directly responsible for the training and supervision of Officer Fitch and members of the MPD. Pls.' Mem. at 7 (citing Dep. of Dorian DeSantis, Pls.' Ex. 14 at 105). They claim that Chief Ramsey was regularly involved with the training of the D.C. police officers, *id.*, and that Chief Ramsey was "directly responsible for the training of Officer Fitch." *Id.* at 11. Only by wrenching Mr. DeSantis's testimony completely out of context can counsel make this argument. Mr. DeSantis[6] actually

---

[6] Plaintiffs did not submit the pages of the deposition of Mr. DeSantis that would inform the Court of his position or rank and their brief gives no further illumination.

testified that Chief Ramsey never takes part in the meetings at which training is planned, DeSantis Dep. at 102; that the "ultimate authority" on training is Lieutenant Galway, *id.* at 103; and that he has no idea of whether the Chief has "actual input" into the training courses, *id.* at 105. Chief Ramsey "goes through the training," but that only means that he takes the courses along with everyone else. *Id.* at 100, 105.[7]

It does not aid Plaintiffs to cite *Barham v. Ramsey*, 338 F. Supp. 2d 48, 62-63 (D.D.C. 2004), as that case involved Chief Ramsey's direct command of the planning and handling of the protests and demonstrations against the International Monetary Fund and World Bank in April 2000. There is no comparable evidence in this record that Chief Ramsey played a direct role in the training of officers and, in fact, the smattering of evidence on point is to the contrary. Similarly, *Qutb v. Ramsey*, 285 F. Supp. 2d 33 (D.D.C. 2003), cited by Plaintiffs, provides no support for their case as Chief Ramsey was dismissed as a defendant in *Qutb*, *id*. at 36 n.2, and the only relevant issue was whether MPD officers properly impounded Mr. Qutb's automobile. *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), and *Daskalea*, also cited by Plaintiffs, have no applicability here. *Dellums* was a case in which the court found that the Chief of the Capitol Hill Police did not act in good faith in arresting protestors at the Capitol when he knew that his notice to disperse was wholly inadequate. *Daskalea*, as described above, is even further afield, arising from extreme conditions in the D.C. Jail

---

[7] While Plaintiffs suggest that Officer DeSantis was "afraid to say more," Pls.' Mem. at 11, the suggestion again relies entirely upon misreading the transcript. Mr. DeSantis testified that Chief Ramsey "should" go through retraining every six months along with every other MPD officer without affirmatively testifying that Chief Ramsey "does" go through such regular re-training. *See* DeSantis Dep. at 105 (Q. So is it your testimony everyone is trained every six months? A. Yes. Q. And everyone goes through the same training . . . . A. That's correct. Q. Including Chief Ramsey? A. He should. I want to keep my job."). In this context, the further statement, "I want to keep my job," was clearly jocular in meaning.

and discrimination against female prisoners.[8]  What these cases stand for is that different factual scenarios can give rise to personal or municipal liability.  They do not, as Plaintiffs argue, establish any facts in this case.

Plaintiffs make a failure-to-supervise claim in addition to their failure to train claim. In support of this allegation, they rely on yet another inapplicable case, *Cox v. District of Columbia*, 821 F. Supp. 1 (D.D.C. 1993).  This 1993 decision concerning D.C.'s failure to maintain an adequate system of disciplining police officers is insufficient to show that the same held true in 2003 when Ms. Johnson was shot.  Defendants respond that MPD has taken multiple measures since 1999 to reduce the use of excessive force: (1) annual re-training on the use of force; (2) increase roll call training; (3) implementation of a Force Investigation Team; and (4) the Force MOU.  Defs.' Mem. Ex. 1, Gainer Dep. at 22-28.  Plaintiffs do not dispute any of these facts.

To bolster their claims against the District of Columbia and Chief Ramsey, Plaintiffs cite to the allegations of their own Amended Complaint and then draw the conclusion that "the police culture has an attitude of discriminating against black citizens of the District of Columbia," with the result that "innocent citizens are being killed by police officers who are more quick to draw their weapons against poor and black people" than in surrounding jurisdictions.  Pl.' Mem. at 10. For this proposition, Plaintiffs cite the deposition testimony of Lt. Kishter and Detective Rita McCoy.  According to Plaintiffs, Lt. Kishter testified to "four (4) categories followed by the District of Columbia police"– and known by Chief Ramsey – "which justif[y] [] D.C. police officer[s] in using their weapons." *Id.*  This statement does not fairly or accurately reflect Lt. Kishter's testimony.

---

[8] Notably, the head of the Department of Corrections was not sued in her individual capacity in *Daskalea*.  227 F.3d at 437.

Apparently asked about the incidence of weapons discharge by police in the District,[9] Lieutenant Kishter identified four factors that "have a high causation of crime in general." Kishter Dep. at 15; *see also id*. at 16 ("I guess going back to what I said earlier, they're just all causations of crime."). The four factors identified by Lieutenant Kishter were "social," meaning "the way things occur in neighborhoods," *id.*; "economical," meaning the many poor neighborhoods in D.C., *id.* at 17; "crime," meaning the "substantially higher" rate of threats against police officers in D.C., *id.* at 28; and "employment," meaning that the larger number of unemployed D.C. residents may "commit crimes to feed their families." *Id.* at 33. Lt. Kishter did *not* say that these four factors justify police use of weapons; rather, they were, in his mind, the causes for criminal conduct.

Detective McCoy testified to no facts that would support the argument of Plaintiffs' counsel. *See* Pls.' Ex. 16 (McCoy Dep.). Asked about the four factors identified by Lt. Kishter, Detective McCoy politely disagreed and stated that drugs are the number one impetus to crime in D.C. *See id.* at 209-210. As she explained:

> I said drugs only because, especially in this city[,] because I'm a D.C. girl, brought up in the projects of D.C. I know the city, you know, this is my home. And I know when I lived – I grew up in a – you know, it was [a] black neighborhood, and everybody mostly worked. . . . [Don't] get me wrong, we were on welfare, but a lot of people worked, too, including my mom, and took care of her children. . . . [I]t was a nice community, nice people. . . .
>
> And then the latter part of the '70s into the early '80s [came] the drugs. I mean it was always a little bit of heroin, but those guys were very respectful. They kept their business [sic]. It was very few people. But when the crack hit the city, it changed everything. That's why we had all

---

[9] As explained above, Plaintiffs have submitted only pages 13-36 of the deposition of Lieutenant Kishter and the exact question they posed and Lt. Kishter's response is not included. Although Plaintiffs contend that Lt. Kishter testified that MPD officers discharge their weapons more frequently than policemen in other jurisdictions, they have failed to submit any such testimony.

> those murders.
>
> . . .
>
> I think that the drugs are a tremendous negative influence in any community, white or black.

*Id.* at 210-212.  These officers testified to the greater incidence of crime in D.C. compared to surrounding jurisdictions and then traced the causes for the City's crime to drugs, poverty, social factors and other things.  Their testimony in no way indicates that MPD and Chief Ramsey follow four factors to justify discharging officers' guns against the populace.

Plaintiffs also rely on the 2001 Force MOU to support their allegations of failure to train and supervise.  *See* Pls.' Mem. Ex. 13.  The mere existence of this Force MOU does not prove that the District of Columbia or Chief Ramsey had actual or constructive knowledge that Officer Fitch or any other MPD officer was not properly trained or supervised.  A plaintiff cannot avoid summary judgment by way of citations to her own complaint and calls to the court to draw all inferences in her favor.  *See Celotex*, 477 U.S. at 322 (by pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment); *Greene,* 164 F.3d at 675 (nonmoving party must present specific facts that would enable a reasonable jury to find in its favor).  No matter how vigorous the arguments of counsel, they cannot and do not substitute for facts from which a jury might find in his client's favor.  Because Plaintiffs have failed to submit any evidence whatsoever in support of their section 1983 claim for failure to properly hire, train, and supervise MPD officers (Count VII), the claim must be dismissed.[10]

---

[10] In addition to Plaintiffs' claim of negligent hiring, training, and supervision in violation of section 1983, Defendants presume that Plaintiffs have stated a claim for common law negligence.  Defs.' Mem. at 21-24.  The Court does not find such a claim in the Amended Complaint.  If it did, it would have to agree with Defendants that the claim should be dismissed due to Plaintiffs' failure

**C. Qualified Immunity**

Defendants contend that Officer Fitch is not liable under section 1983 based on qualified immunity. Qualified immunity shields a government official from liability under section 1983 provided that the official's conduct did not violate a clearly established constitutional right of which a reasonable person would have known. *Wilson v. Layne*, 526 U.S. 601, 609 (1999). Even if he was mistaken regarding the need to utilize force, a police officer will prevail on a qualified immunity defense if a reasonable officer possessing the same information could have believed that his conduct was lawful. *Dist. of Columbia v. Evans*, 644 A.2d 1008, 1016 (D.C. 1994). "So long as the officer's actions, viewed from the perspective of the officer at the time, can be seen within the range of reasonableness, then no liability will attach." *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995).

Defendants contend that qualified immunity applies because, viewed from the perspective of Officer Fitch, he reasonably believed that Ms. Johnson had a gun in her hand and thus his use of force was reasonable and not excessive. Defendants point out that the deposition testimony of the officers supports this view. Further, they argue, "Mr. Wade . . . cannot testify as to what Officer Fitch saw at the time of the shooting." Defs.' Reply at 6.

Contrary to Defendants' assertion, the eyewitness testimony of Mr. Wade that Ms.

---

to name an expert to testify regarding the standard of care. *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 89 (D.D.C. 2000) (expert testimony is required to establish the standard of care for a claim of negligent supervision); *Predzin v. DC Arena Limited P'ship*, No. 02-9582, at *5 (D.C. Sup. Ct. Oct. 7, 2003) (expert testimony needed to establish standard of care for claim of negligent hiring, training, and supervision). The report of Plaintiffs' expert, Joseph Stine, does not offer an opinion on the standard of care for the hiring, training, or supervision of MPD officers. Defs.' Mem. Exs. 10 & 11; see Ex. 8 (Stine Dep.) at 210-14 (Mr. Stine stated he was not rendering an opinion regarding deficient training or negligent hiring and retention).

Johnson was unarmed at the time of the shooting, and Ms. Thomas' similar testimony, raise genuine issues of material fact. This evidence raises questions concerning exactly what information Officer Fitch had at the time of the shooting and whether, under the circumstances, a reasonable police officer could have believed that Ms. Johnson was armed. These are jury questions to be determined in light of the credibility of the officers and the eyewitnesses.

### D. Negligence and Negligent Infliction of Emotional Distress

The D.C. Defendants contend that Plaintiffs' negligence claims should be dismissed because they are indistinguishable from their claims for assault and battery, relying on *Dist. of Columbia v. Chinn*, 839 A.2d 701, 710 ((D.C. 2003) and *Sabir v. Dist. of Columbia v. Tinker*, 755 A.2d 449, 452 (D.C. 2000). The law of the District of Columbia is clear that "[t]here is no such thing as a negligent assault." *Id.*, 755 A.2d at 452 (quoting 1 Fowler Harper & Fleming James, The Law of Torts § 3.5 at 3:19 (3d ed. 1996)). Where a plaintiff does not allege or prove a distinct negligence ground, the negligence claim should be dismissed. *Chinn*, 839 A.2d at 710.

However, the court in *Chinn* recognized, as did this Court in *Hudson v. Dist. of Columbia*, No. 02-2217, 2005 WL 1378905 (June 9, 2005), that there are two lines of cases. One line of cases is represented by *Sabir* where separate negligence and battery claims were precluded because the plaintiffs did not plead separate and distinct claims. The other line of cases permits the pleading of separate negligence and assault and battery claims. This line is represented by *District of Columbia v. White*, 442 A.2d 159 (D.C. 1982). In *White*, the complainants in a wrongful death action based on a police shooting were allowed to submit both a negligence claim and an assault and battery claim to the jury. *Chinn*, 839 A.2d at 710; *Hudson*, at *5.

This case is closely analogous to the *White* line of cases because these cases share

common characteristics, notably the use of deadly force and evidence of two opposing factual scenarios — that is, a police officer claiming he shot in self defense and a witness claiming the decedent was unarmed when shot. *Chinn*, 839 A.2d at 709-10.

> Each of the cited cases in the *White* line that have upheld submitting both negligence and battery counts to a jury have common characteristics. Each involves the use of deadly force. Each invokes a police regulation establishing a standard of care with respect thereto that is arguably distinct from the excessive force standard. Each involves alternate scenarios in at least one of which a distinct act of negligence, a misperception of fact, may have played a part in the decision to fire. Each involves a negligent act that precedes the application of the relevant force of resort to firearms, i.e., prior to the pulling of the trigger.

*Id*. at 710-11.

Similarly, here Plaintiffs have brought a wrongful death suit alleging that Officer Fitch improperly used deadly force. Defendants contend that Officer Fitch was justified in using such force because he reasonably believed it was necessary to shoot Ms. Johnson to protect his life and the life of others. Other witnesses, Ms. Thomas and Mr. Wade, contend that when Officer Fitch shot Ms. Johnson, she was unarmed. So here, a "distinct act of negligence, a misperception of fact, may have played a part in the decision to fire." *Id*. Plaintiffs have advanced a claim for negligence, a claim for negligent infliction of emotional distress, and a claim for assault and battery, and they may submit each of these claims to a jury.

### IV.  CONCLUSION

As explained above, Defendants' motion for partial summary judgment [Dkt. # 40] is granted in part and denied in part. Accordingly, the following claims set forth in the Amended Complaint are dismissed:  the Fifth and Fourteenth Amendment claims (set forth as part of Count

I); the claim regarding an unconstitutional custom, practice, or policy related to the use of force (Count II); the claim regarding the failure to properly hire, train, and supervise (Count VII). The claims remaining are (1) a section 1983 claim against Officer Fitch, alleging excessive use of force in violation of the Fourth Amendment (Count I); (2) negligence (Count V); (3) assault and battery (Count VI); and (4) negligent infliction of emotional distress (Count VIII).


Date: February 23, 2007                             _____/s/_____
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge